IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JACK D. JOWERS                                                    PLAINTIFF

                    v.                        Civil No. 08-2041

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                   DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Jack Jowers, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying his claim for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI")  under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

## I.    Procedural Background:

The plaintiff protectively filed his applications for DIB and SSI on February 14, 2005, alleging an amended onset date of March 15, 2005[1], due to generalized anxiety disorder, bipolar disorder, bilateral degenerative joint disease of the knees status post multiple operations, degenerative disc disease of his lumbar and cervical spine, arthritis, lower calf pain, upper thigh pain, hip pain, attention deficit hyperactivity disorder, bipolar disorder, sleep disorder,

---

[1] Originally, plaintiff alleged an earlier onset date.  However, at the hearing, he amended his onset date to this date, due to the fact that plaintiff had continued to work.

alcoholism, depression, anxiety, and panic attacks.  (Tr. 16, 85-87, 113-114, 120, 122, 127-132, 134, 150, 154-161, 182, 420).

A hearing was held on June 12, 2007.  (Tr. 406-441).  Plaintiff was present and represented by counsel.  At this time, plaintiff was 37 years of age and possessed a GED and had completed three years of college course work.  (Tr. 24, 93, 412).  He had past relevant work ("PRW") experience as an auto mechanic, construction worker, maintenance worker, shipping manager, office equipment repairman, tire repairman, and cook/crew leader in the fast food industry.  (Tr. 24, 86, 95-101, 180-181, 413-420).

On September 12, 2007, the Administrative Law Judge ("ALJ") concluded that, although severe, plaintiff's impairments did not meet or equal any Appendix 1 listing.  (Tr. 14-21).  She found that plaintiff maintained the residual functional capacity ("RFC") to perform sedentary work with a sit/stand at will option; that did not require walking on uneven surfaces, driving, climbing scaffolds/ladders/ropes, crawling, kneeling, balancing, working near unprotected heights, or working around dangerous machinery or equipment; and, required only occasional climbing stairs and ramps, stooping, bending, and crouching at all exertional levels.  (Tr. 15).  From a non-exertional standpoint, the ALJ also concluded that plaintiff should work at a job that is non-complex in nature; involves simple instructions and little judgment with routine/repetitive tasks which are learned by rote with few variables; and, involves goals set for the claimant, superficial contact that is incidental to work with public and co-workers, and concrete, direct, and specific supervision. (Tr. 21).  With the assistance of a vocational expert, the ALJ then determined plaintiff could perform work as a bench assembler, surveillance monitor, and products inspector.  (Tr. 25).

2

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on March 10, 2008. (Tr. 3-5). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned for report and recommendation. Both parties have filed appeal briefs, and the case is now ready for decision. (Doc. # 6, 7).

## II.    <u>Applicable Law:</u>

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Id.* "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Id.* As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse the decision simply because substantial evidence exists in the record to support a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). If we find it possible "to draw two inconsistent positions from the evidence, and one of those positions represents the Secretary's findings, we must affirm the decision of the Secretary." *Cox*, 495 F.3d at 617 (internal quotation and alteration omitted).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results

3

from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

### A.    The Evaluation Process:

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require his to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and

AO72A
(Rev. 8/82)

work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

### III.   **Evidence Presented**:

On April 21, 2004, plaintiff underwent ACL reconstruction using bone-patellar-bone allograft as well as a meniscectomy and meniscal repair. (Tr. 215-218). Previous MRI's and x-rays had revealed a tear involving the posterior horn of the medial meniscus of the right knee with a possible tear involving the anterior cruciate ligament of the right knee. (Tr. 212, 383-385). Plaintiff indicated that he had twisted his body around his right knee and felt a loud "pop." (Tr. 213). Initial post surgery follow-up notes indicate that plaintiff had an uneventful recovery. (Tr. 205-214). A venous doppler study of his right knee revealed no evidence for deep venous thrombosis of the right lower extremity. (Tr. 217-218).

On July 21, 2004, plaintiff underwent a psychiatric evaluation with Dr. Thomas Thieman. (Tr. 198-200). He indicated that he had previously worked in the computer field, but was no longer working. Plaintiff was planning to attend college, and reported "a lot of stress" taking care of his infant daughter. He also reported marital discord, insomnia, shakiness, tremors, dizziness, sweating, occasional palpitations and shortness of breath, chronic worry, and feeling sad and blue quite often. His concentration was only fair and he reported an uncertain future and low energy. Plaintiff indicated that he had stopped consuming alcohol approximately 4 months prior, but stated he would likely consume one drink every six months. His current medications were Ultram and Bengolea as per Dr. Steven Mirabello, plaintiff's surgeon. Dr. Thieman noted plaintiff was of average height, thin, casually attired, and exhibited good personal hygiene. His average rate of walking and talking varied, slow at times and faster at other times, but not to the

5

point of being hyperverbal.  Plaintiff was cooperative, accessible, dysphoric, exhibited coherent and goal directed speech, was completely oriented, exhibited an adequate recent and remote memory, and seemed motivated for treatment.  His anxiety was moderate to severe at times.  Dr. Thieman prescribed Trazodone, Wellbutrin, and Effexor.   (Tr. 198-200).

On August 19, 2004, plaintiff was admitted to the Harbor Behavioral Care Institute. (Tr. 188-197).  The previous day, he presented after overdosing on alcohol and medication.  Plaintiff reported that his wife left with his daughter, and he "lost it."  He started drinking and taking his medications, and was later found on the street.  Plaintiff denied suicidal ideations and reported no history of overdosing or suicide attempts, but did complain of increased depression, anxiety, and insomnia.  He also reported a two month history of marital counseling.  Plaintiff stated that he drank once per month until he got drunk, due to marital discord.  Records indicate he was treated via Wellbutrin, Effexor, Xanax, and Trazodone.  Dr. Andres Martin noted that plaintiff was disheveled in appearance and exhibited logical, coherent, and goal directed speech.  He diagnosed plaintiff with episodic alcohol abuse and bipolar affective disorder vs. major depression.  Dr. Martin assessed plaintiff with a global assessment of functioning score of 48. Upon admission, the Xanax and Effexor were discontinued in favor of Lexapro.   After expressing his need to return home within 24 to 48 hours due to college classes, plaintiff was released home on August 20, 3004, into his father's care. (Tr. 189).  Upon discharge, plaintiff was diagnosed with major depression and alcohol abuse.  He was prescribed Wellbutrin XL, Lexapro, Benadryl, and Trazodone.  At this time, his GAF was reportedly 62. (Tr. 189).

On September 5, 2004, plaintiff was treated at the hospital after he "began seeing people and moving objects" the previous evening.  (Tr. 233).  He was diagnosed with depression,

anxiety, and psychiatric problems.  (Tr. 233, 234).  His affect was noted to be depressed and there was evidence of psychosis.  Plaintiff stated his belief that he had accidentally taken extra medication.  Plaintiff was diagnosed with depression and anxiety, and administered Ativan to control his agitation.  (Tr. 235).

On October 29, 2004, plaintiff collapsed and missed his chair while in a bar.  (Tr. 230). He was diagnosed with an substance abuse and alcohol intoxication stupor.  (Tr. 231).

Dr. Saurin Shah treated plaintiff for knee pain on January 7, 2005.  (Tr. 221).  He noted plaintiff's medical history but found no joint effusion. (Tr. 221).  X-rays dated January 11, 2005, revealed minimal joint space narrowing involving the medial and patellofemoral compartment, but no other abnormalities.  (Tr. 241).

On January 26, 2005, plaintiff presented in the emergency room with lower extremity problems.  (Tr. 227-228).   He was diagnosed with chronic pain.  (Tr. 227,228).

On January 11, 2005, x-rays of plaintiff's right knee revealed minimal joint space narrowing involving the medial and patellofemoral compartment, but nothing else of significance. (Tr. 241, 375).

In a follow-up report dated January 28, 2005, Dr. Shah noted the results of plaintiff's x-rays and assessed him with degenerative joint disease.  (Tr. 239).  He also ordered an MRI.  (Tr. 228).  The MRI revealed small joint effusion, but no acute abnormalities were detected.   (Tr. 239, 377).

On March 7, 2005, plaintiff was evaluated for physical therapy.  (Tr. 242-244).  It was recommended that he attend rehabilitative therapy three times per week for four weeks.  A daily home exercise program was also prescribed.  (Tr. 242-244).

7

On March 15, 2005, plaintiff was evaluated by Dr. Eric R. Haynes, a pain specialist. (Tr. 247-248, 371-372). Dr. Haynes noted plaintiff's history of weight loss, peptic ulcers, and migraines. He also indicated that plaintiff appeared to be very focused on pain, reporting pain with walking and flexion. Plaintiff had a well-healed incision with good movement of his knee. A full range of motion was noted with intact senses and reflexes. Dr. Haynes diagnosed plaintiff with chronic right knee pain, possibly neuropathic in nature. (T.247, 248, 371, 372). He prescribed Topamax and ordered a triple phase bone scan to rule out reflex sympathetic dystrophy. (Tr. 248).

On March 29, 2005, the bone scan revealed abnormal increased uptake only on the delayed images over the right knee probably related to post-op changes, but no abnormal uptake noted on the blood flow or blood pool images. (Tr. 246, 374).

On April 11, 2005, plaintiff continued to report stabbing type pain in his right knee. (Tr. 245, 370). He scored his pain as a 9 on a 10 point scale. Rosemary Clanton, a nurse practitioner, reviewed plaintiff's bone scan results and diagnosed him with possible neuropathic pain in the right lower extremity. She prescribed Vicodin and a trial of Cymbalta. Ms. Clanton also advised him to return in 2 months for a follow-up with Dr. Rudy. (Tr. 245).

On May 25, 2005, Dr. Steven Kanakis, a licensed psychologist, evaluated plaintiff for the Social Security Administration. (Tr. 249-251). Plaintiff reported a history of childhood abuse by his father and stepmother. He also reported behavioral problems in high school and admitted to active alcohol dependence. (Tr. 250). Dr. Kanakis noted plaintiff's gait was slow, but steady. He walked with his right leg stiff and extended to the side. (Tr. 250). Plaintiff's mood was calm and his affect appropriate. (Tr. 250). His speech was normal and spontaneous, his thought

8

processes were logical and coherent, and no evidence of thought disorder was noted.  He denied any suicidal or homicidal ideations, although he did report a history of assault.  (Tr. 250).  Dr. Kanakis opined that plaintiff's IQ appeared to be about average and he exhibited a good general fund of information.  (Tr. 251).  Plaintiff's attention was also noted to be good as measured by the Digit Span.  Dr. Kanakis diagnosed plaintiff with alcohol dependence, major depressive disorder in partial remission, and anxiety disorder.  He found plaintiff to be most in need of detoxification followed by long-term substance abuse counseling.  His depression and anxiety appeared to be under adequate control through the use of psychiatric medication, although he needed to be re-evaluated once he was sober.  Dr. Kanakis stated that plaintiff's prognosis was guarded.  He found him to be at some risk of suffering decompensation in a work-like setting. (Tr. 251).

On July 12, 2005, plaintiff was going to pain management for chronic pain.  (Tr. 349-350).  He indicated that his knee pain had gotten worse.  Eric Zimmerman, a physician's assistant with Dr. Mirabello's office, noted no effusion, swelling, signs of infection, or cellulitis.  Plaintiff complained of pain on flexion past 110 degrees.  There was no varus or valgus instability. Plaintiff did complain of pain over the medial aspect of the knee and positive patella grind.  Most of his pain was over the kneecap and he was very hypersensitive to any palpation.  As Dr. Mirabello had recommended that plaintiff undergo physical therapy, Mr. Zimmerman discussed this with plaintiff.  Plaintiff was noted satisfied with this and requested to see Dr. Mirabello, who was unavailable.  Plaintiff became irate and stated he would be contacting his attorney.  Plaintiff was given an appointment to follow-up in 4-6 weeks, when he completed physical therapy.  (Tr. 349-350).

9

On July 18, 2005, Dr. Rudy Panganiban, a pain specialist, noted plaintiff's persistent and progressive knee pain. (Tr. 366-367). He described the pain as nociceptive/neuropathic in nature, made worse by prolonged activity and relieved by rest. Plaintiff ordered EMG/nerve conduction studies, prescribed Lidoderm patch and physical therapy, and recommended considering lumbar sympathetic blockade. (Tr. 366-367).

On July 29, 2005, x-rays of plaintiff's left knee showed early degenerative changes, but no fracture or soft tissue swelling. (Tr. 322).

On August 13, 2005, plaintiff complained of right knee pain. (Tr. 368-369). Dr. Panganiban noted medial meniscal tenderness, MCL tenderness, and positive knee instability in the stance phase. However, a function range of motion was noted in all areas. He recommended VMO strengthening and an orthopaedic evaluation to assess for possible surgical intervention. (Tr. 368-369).

On September 9, 2005, Indra Ramdayal, Dr. Haynes' nurse practitioner, advised plaintiff to continue taking Percocet. (Tr. 363). There were no changes in his condition, but he did discuss his severe depression and bipolar, and how those affected his pain management. Plaintiff reported increasing knee pain. He was directed to follow-up in one month. (Tr. 363).

On October 8, 2005, Dr. Panganiban saw plaintiff to review his rehabilitation regimen for osteoarthritis and degenerative joint disease. (Tr. 324-325, 364-365). Dr. Panganiban reported that plaintiff's systems were positive for neurologic and musculoskeletal problems. (Tr. 324). However, no evidence of divergent behavior/activity was noted. An examination revealed a functional range of motion in the cervical and thoracolumbar regions of the spine, as well as the lower extremities. The doctor recommended aquatic therapy and discussed the possibility

10

of an osteoporosis program involving moderate to high intensity weight bearing exercises.  (Tr. 325).  Dr. Panganiban indicated that plaintiff's goal was to achieve approximately 60% relief of pain translating to improvement of function with both basic and advance activities of daily living.  (Tr. 325).

On November 7, 2005, plaintiff was stable on his pain medication regimen.  (Tr. 361-362).

On December 2, 2005, plaintiff remained stable.  (Tr. 359-360).  Dr. Panganiban directed plaintiff to continue his current pain medication regimen.  (Tr. 359-360).

On December 9, 2005, an MRI of plaintiff's lumbar spine revealed mild disc degeneration with a disc bulge at L5-S1 level, which was not causing any significant central canal stenosis or neural foraminal narrowing.  (Tr. 373, 389).

On December 29, 2005, plaintiff exhibited continued ligamentous instability.  (Tr. 357-358).  His functional deficits included an antalgic gait.  Plaintiff reported that the Percocet was not beneficial for his pain.  Therefore, Dr. Panganiban prescribed the Duragesic patch.  (Tr. 357-358).

On February 6, 2006, Dr. Mirabello saw plaintiff for a follow-up examination.  (Tr. 338, 348).  At this time, plaintiff reported that his right knee was "horrible" and his left knee was also bothering him.  (Tr. 338).  He reported pain on the outside of the retinaculum and the inside of the kneecap.  Plaintiff was reportedly taking narcotic pain medication without relief.  After reviewing plaintiff's MRI results, he determined plaintiff's condition was consistent with lateral patellofemoral compressive syndrome, which caused severe pain.  (Tr. 338).  He stated he could perform a scope of the knee and possibly perform a lateral release to free up the knee cap.

11

However, he could offer no guarantees.  Further, plaintiff could be worse off, as he could develop RSD or continue to experience chronic pain.  (Tr. 338).  Plaintiff requested a scope on both knees, but Dr. Mirabello did not think it wise.  Instead, he ordered an MRI of plaintiff's left knee and scheduled him to undergo lateral release surgery.  (Tr. 338).

On February 14, 2006, plaintiff underwent an MRI of his left knee.  (Tr. 340, 391).  It revealed a non-aggressive mildly lobulated T2 hyperintense bone lesion on the posterior medial aspect of the femoral metaphysic; increased signal at the posterior horn medial meniscus close to the inferior articular surface, evidencing a possible tear; and, an attenuated ACL that appeared somewhat lax with buckling of the PCL suggesting a chronic ACL deficient knee.   (Tr. 340, 391).

On February 21, 2006, plaintiff reported some pain.  (Tr. 339, 347).  Plaintiff was taking Percocet, but requested Hydromorphone.  He was able to get up, get out of the chair, and hook his leg up to the cooling wrap, which did seem to help.  An examination revealed very minimal swelling, with no redness or erythema.  Plaintiff's request for additional pain medication was denied.  It was believed that his pain was post-surgical pain and would subside as the wound healed.  (Tr. 339).

On March 2, 2006, plaintiff reported his pain as a 9 on a 10 point scale.  (Tr. 345-346).  Dr. Panganiban reviewed plaintiff's most recent MRI, and again noted a functional range of motion in all areas.  He advised plaintiff to continue the Avinza and Percocet.  (Tr. 345-346).

On March 7, 2006, plaintiff was doing well. (Tr. 337, 344). However, he remained hypersensitive.  Dr. Mirabello noted excellent lateral release, and he could flex to 100 degrees.  Plaintiff wanted surgery on his left knee, but Dr. Mirabello refused to perform surgery until

plaintiff progressed to the point where he felt comfortable performing the procedure.  Therefore, he tentatively scheduled plaintiff for surgery in three weeks.  (Tr. 337).

On March 17, 2006, Dr. Panganiban wrote a letter to plaintiff indicating that he would no longer be able to continue as his physician, due to plaintiff's non-adherence in his pain management plan.  (Tr. 342).

On March 29, 2006, plaintiff called Dr. Henry Hanff's office in desperation, requesting Percocet.  (Tr. 336).  Dr. Hanff noted that plaintiff has previously been dropped by pain management.  Plaintiff's primary care physician politely declined to prescribe any strong pain medications, and Dr. Hanff agreed. He refused to prescribe Oxycodone and recommended over-the-counter Tylenol instead.  (Tr. 336).

On April 3, 2006, plaintiff continued to experience pain, mainly over the lateral release site. (Tr. 335).  He had a full range of motion with excellent lateral release and no effusion.  Dr. Mirabello noted good progress.  He recommended that plaintiff use Speed Gel, Lidoderm patches, and scheduled him for surgery on his left knee.  (Tr. 335).

On April 6, 2006, Dr. Mirabello performed lateral release surgery on plaintiff' left knee. (Tr. 333-334).  Postoperatively, plaintiff was diagnosed with a partial ACL tear and lateral patellofemoral syndrome of the left knee.  (Tr. 333).

On April 7, 2006, plaintiff complained of severe pain in his left knee. (Tr. 331-332).  He had reportedly sought emergency treatment the previous night and earlier in the day for this pain. He received an injection of Morphine and a prescription for Percocet.  Plaintiff indicated that the medication was not helping his pain.  He also reported that the drain did not seem to be working. A moderate amount of swelling was noted about the knee and it was tender to palpation.  Further,

13

the drain seemed to have been pulled out.  The drain was extracted and the wound was redressed with a knee immobilizer.  Plaintiff was then told he could take Motrin in addition to the Percocet.  He was also advised to elevate his leg and use ice.  (Tr. 331-332).

On April 14, 2006, plaintiff indicated that the physical therapy did seem to be helping.  (Tr. 330).  He continued to complain of some pain in his knee, along with some swelling about the kneecap.  Plaintiff had reportedly gone to Busch Gardens, but used a motorized wheelchair while there.  An examination revealed some swelling and some patella ballottement, but not an excessive amount.  His sutures were removed and he was advised to elevate his knee.  (Tr. 330).

An x-ray of plaintiff's left knee, dated April 15, 2006, revealed moderate joint fluid without fracture.  (Tr. 379).  No other abnormalities were noted.  (Tr. 379).

On April 18, 2006, plaintiff stated that he had been seen in the emergency room over the weekend because his daughter ran over his left knee.  (Tr. 329).  As a result, a small amount of pus came of out his knee, and he was concerned about infection.  The doctor placed him on antibiotics.  A physical exam revealed only minimal swelling and not purulent drainage.  Therefore, plaintiff was directed to continue his physical therapy.  (Tr. 329).

On May 15, 2006, plaintiff was evaluated by Bradley Cohen, a nurse practitioner with Dr. Mirabello's office.  (Tr. 328).  Plaintiff reported doing okay and progressing well with physical therapy.  However, he continued to complain of some pain along the lateral aspect where the release was done.  A mild amount of swelling and some evidence of patella ballottement were noted.  Plaintiff could demonstrate good passive flexion of the knee, past 110 with very little discomfort. Mr. Cohen commended plaintiff on his status and progress.  (Tr. 328).

14

On May 30, 2006, plaintiff was reportedly doing very well. (Tr. 327). He continued to experience soreness and instability in his left knee. However, plaintiff felt that using the brace on his right knee would help. Therefore, Dr. Mirabello fitted him for a brace and directed him to continue doing the exercises. He also prescribed Lidoderm patches. (Tr. 327).

On June 27, 2006, an MRI of plaintiff' thoracic spine showed no focal disc protrusion/extrusion or stenosis and a minor left paracentral disc bulge of T3-4 disc. (Tr. 388).

On July 24, 2006, an x-ray of plaintiff's right shoulder revealed mild inferior spurring of the distal clavicle of uncertain significance. (Tr. 381).

On August 10, 2006, plaintiff underwent an MRI shoulder arthrogram. (Tr. 390). The results revealed mild hypertrophic changes in the AC joint and downward stopping acromion, subacromial stenosis, and somewhat decreased joint capacity. (Tr. 390).

On November 6, 2006, an MRI of his cervical spine revealed minor posterior disc bulges of the C3-4 through C6-7 discs without any mass effect on the spinal cord. (Tr. 387). No focal disc extrusion or central canal stenosis. However, no neural foramina stenosis was noted. (Tr. 387).

## IV.   Discussion:

We first turn to the ALJ's evaluation of plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and, (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's

15

subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  *Id*.  As the United States Court of Appeals for the Eighth Circuit  recently observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the record, we believe that the ALJ adequately evaluated the factors set forth in *Polaski*, and conclude there is substantial evidence supporting his determination that plaintiff's complaints were not fully credible.  The testimony presented at the hearing as well as the medical evidence contained in the record are inconsistent with plaintiff's allegations of disability.

We note plaintiff's history of bilateral knee pain and surgery on both knees.  The record makes clear that plaintiff has continued to experience pain and discomfort, as well as some degree instability, in both knees since the time of his surgeries.  However, the medical evidence does not support plaintiff's contention of total disability.  *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability).  Records show that plaintiff progressed well after his surgeries.  Minimal findings were documented at each follow-up appointment, and plaintiff was noted to have a full range of motion.  (Tr. 205-218, 227-228, 239, 241, 245-248, 322, 324-325, 327-333, 335, 337-340, 345-346, 349-350, 359-362, 366-370, 373, 375, 377, 387-388, 390).  Although plaintiff wore braces on both knees to help with stability following his last surgery in 2006, plaintiff indicated that the braces helped.  He did not seek additional medical treatment for knee pain or knee related problems after May 2006.  (Tr. 327).

16

The evidence also indicates that plaintiff suffered from pain resulting from mild disc degeneration with a disc bulge at L5-S1 level and minor posterior disc bulges of the C3-4 through C6-7 discs.  (Tr. 373, 387, 389).  However, plaintiff did not seek a great deal of medical treatment for these alleged impairments.  *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider).  And, in October 2005, Dr. Panganiban noted a functional range of motion in the cervical and thoracolumbar regions of the spine.  While we do agree that these impairments resulted in pain and discomfort which made certain activities difficult, we cannot say that they rendered plaintiff disabled, singularly or in combination with his other impairments.  *See Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled).  At least for a period of time, plaintiff was able to attend college, attend college related socials and activities, take care of his daughter, perform some household chores, and attend church without difficulty.

Although plaintiff alleges lower calf pain, upper thigh pain, and hip pain as additional grounds for disability, we can find no consistent evidence to support his contentions.  In April 2005, plaintiff was diagnosed with  possible neuropathic pain in the right lower extremity.  (Tr. 245).  However, by October, Dr. Panganiban noted a functional range of motion in plaintiff's lower extremities.  (Tr. 325).  While we do believe it possible for plaintiff's knee and/or lower back pain to radiate into plaintiff's lower extremities, we do not find evidence to indicate that this pain was so significant as to prevent the plaintiff from performing all work-related activities.

Plaintiff contends that he experienced severe pain, rendering him disabled.  As previously mentioned, it is clear that plaintiff suffered from some degree of pain.  The degree of pain,

AO72A
(Rev. 8/82)

however, is not clear.  In March 2005, Dr. Haynes noted that plaintiff seemed very focused on his pain. (Tr. 247-248, 371-372).  By March 2006, Dr. Panganiban had discharged plaintiff from his care for failure to follow the pain management regimen prescribed.  (Tr. 342).  *See Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) (holding that failure to follow a recommended course of treatment weighs against a claimant's credibility)(citation omitted)).  At least one other doctor also refused to prescribe plaintiff narcotic pain medication, and at one point, plaintiff became irate about his treatment.  (Tr. 336, 339, 349-350).  Then, in April 2006, plaintiff sought emergency treatment in two separate emergency rooms on the same day for the same symptoms, receiving an injection of Morphine from one and a prescription for Percocet from the other.  He then presented at Dr. Mirabello's office with similar complaints, where he was advised that this type of behavior could be misconstrued as doctor shopping.  (Tr. 331-332).  Accordingly, we find this type of behavior negatively impacts plaintiff's credibility concerning the level of pain he was experiencing.

The ALJ also noted that, at the time of the administrative hearing, plaintiff was not taking any prescription pain medication.  *See Haynes v. Shalala*, 26 F.3d 812, 814 (8th Cir. 1994) (lack of strong pain medication was inconsistent with disabling pain).  Instead, he was merely taking muscle relaxers and over-the-counter pain medications.  The fact that plaintiff took over the counter medication for pain relief also detracts from his claim. *See Rankin v. Apfel*, 195 F.3d 427, 430 (8th Cir. 1999);  20 C.F.R. § 404.1529(3)(iv)(The use of nonprescription medication is a relevant consideration when evaluating subjective complaints.).

AO72A
(Rev. 8/82)

As for mental impairments, we note that plaintiff was diagnosed with bipolar disorder, major depression, alcoholism, and generalized anxiety disorder.  Records indicate that he was hospitalized several times prior to his amended onset date.  (Tr. 188-200, 230-235).  However, plaintiff did not seek consistent treatment for his mental impairments during the relevant time period.  *See Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999) (failure of claimant to maintain a consistent treatment pattern for alleged mental impairments is inconsistent with the disabling nature of such impairments).  In fact, in May 2005, Dr. Kanakis noted that plaintiff's depression and anxiety appeared to be under adequate control through the use of psychiatric medication.  (Tr. 249-251).  Further, contrary to his testimony concerning his fear of crowds, plaintiff, himself, reported the ability to attend college, social functions sponsored by the college, and church and shop for groceries, in spite of these alleged impairments.  (Tr. 103-126, 437).  *See Tennant v. Apfel*, 224 F.3d 869, 871 (8th Cir. 2000) (court properly considered plaintiff's part-time college attendance while maintaining a "C" average, which is inconsistent with allegedly disabling joint pain and fatigue).

Plaintiff alleges a sleep disorder and attention deficit hyperactivity diagnoses as additional bases for disability, however, we do not find any evidence to indicate plaintiff was ever diagnosed with these disorders.  *See Forte*, 377 F.3d at 895.  We do believe it is reasonable to conclude that plaintiff's pain could impact his ability to sleep and concentrate.  However, we do not find these symptoms to be disabling.

Plaintiff's own reports concerning his activities of daily living also contradict his claim of disability.  On a disability report dated March 11, 2005, plaintiff indicated an ability to care for some of his personal hygiene needs, attend college and earn "A's and B's", prepare frozen

19

dinners, wash dishes, do the laundry, perform light housework, ride in a car, use public transportation, shop for groceries, pay bills, count change, handle a savings account, use a checkbook/money orders, attend social dinners and functions at the college, and attend church. (Tr. 103-126). On a daily basis, he indicated that he prepared breakfast for his daughter, changed his daughter's diapers, got ready for school, attended classes until noon, fed his daughter lunch, completed homework, took care of his daughter, prepared dinner, and prepared his daughter for bed. (Tr. 111). *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d at 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor). Clearly, these activities are somewhat inconsistent with an allegation of disability.

Plaintiff also contends that the ALJ failed consider the Polaski requirements when rendering her decision. Although the ALJ did not mention Polaski in her opinion, the Polaski factors are outlined in her decision. (Tr. 22). Further, each element was considered in the ALJ's opinion. Therefore, we find no error.

We next turn to the ALJ's determination that plaintiff had the RFC to engage in a range of sedentary work. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. *Id*. This includes

medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

In the present case, the ALJ carefully reviewed the medical records, plaintiff's subjective complaints, the plaintiff's testimony regarding his daily activities, and the functional limitations set forth by the physicians. On April 22, 2005, Dr. Ronald Kline prepared a physical RFC assessment. (Tr. 269-276). After reviewing plaintiff's medical records, Dr. Kline concluded plaintiff could occasionally lift 20 pounds; frequently lift 10 pounds; stand and/or walk about 6 hours in an 8 hour workday; sit for about 6 hours in an 8 hour workday; and, push and/or pull with unlimited capacity. (Tr. 270). He also found plaintiff could only occasionally climb, balance, stoop, kneel or crouch, and could never crawl. (Tr. 271). Dr. Kline opined that the severity of plaintiff' symptoms and their alleged effect on his ability to function was consistent, in his judgment, with the total medical and non-medical evidence. (Tr. 274).

On July 4, 2005, Dr. Timothy Foster completed a Psychiatric Review Technique Form and mental RFC assessment. (Tr. 277-294). Dr. Foster determined that plaintiff suffered from an affective disorder, anxiety-related disorder, personality disorder, and substance addiction

21

disorder.  (Tr. 281).  Specifically, he found plaintiff suffered from depression and anxiety disorder.  Dr. Foster concluded that plaintiff experienced mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and, had experienced no episodes of decompensation of extended duration.  (Tr. 291).  Plaintiff was also moderately limited with regard to completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, interacting appropriately with the general public, maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness, and responding appropriately to changes in work setting.  Dr. Foster opined that plaintiff's main problem was the substance abuse.  (Tr. 293).

On September 28, 2005, Dr. James LeVasseur completed a Psychiatric Review Technique Form and a mental RFC assessment.  (Tr. 295-308, 317-320).  After reviewing plaintiff's medical records, Dr. LeVasseur also determined that plaintiff suffered from an affective disorder, anxiety-related disorder, and substance addiction disorder, i.e., major depression in partial remission and anxiety disorder not otherwise specified.  (Tr. 298, 300, 303).  Dr. LeVasseur concluded that plaintiff experienced mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and had experienced no episodes of decompensation of extended duration.  (Tr. 305).  Plaintiff was moderately restricted in his ability to make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; get along with coworkers or peers without distracting them or exhibiting

behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and, set realistic goals or make plans independently of others. However,  Dr. LeVasseur opined that, when not drinking, plaintiff functioned quite well.  (Tr. 307).

On October 31, 2005, Dr. Thomas F. Renny performed a physical RFC assessment.  (Tr. 309-316).  After reviewing plaintiff's medical records, he determined plaintiff could occasionally lift 50 pounds; frequently lift 25 pounds; stand and/or walk about 6 hours in an 8 hour workday; sit for about 6 hours in an 8 hour workday; and exhibited an unlimited ability to push and/or pull. (Tr. 310).  Dr. Renny also concluded that plaintiff could only occasionally balance.  (Tr. 311).

Giving plaintiff the benefit of the doubt, the ALJ determined that plaintiff could only perform sedentary work that includes a sit/stand option at will; does not require walking on uneven surfaces, driving, climbing scaffolds/ladders/ropes, crawling, kneeling, balancing, working near unprotected heights, or working around dangerous machinery or equipment; and, requires only occasionally climbing stairs and ramps, stooping, bending, and crouching at all exertional levels.  (Tr. 15).  From a non-exertional standpoint, the ALJ also concluded that plaintiff should work at a job that is non-complex in nature; involves simple instructions and little judgment with routine/repetitive tasks which are learned by rote with few variables; and, involves goals set for the claimant, superficial contact that is incidental to work with public and co-workers, and concrete, direct, and specific supervision. (Tr. 21).  After reviewing the medical evidence of record, we find substantial evidence to support the ALJ's determination.

The ALJ's determination that plaintiff could perform sedentary work with a sit/stand option takes into account both plaintiff's knee and back impairments.  The limitations concerning

23

plaintiff's ability to climb, crawl, crouch, kneel, stoop, bend, balance, work near unprotected heights, and work around dangerous equipment covers the stability issues resulting from plaintiff's multiple knee surgeries. From a mental standpoint, the ALJ's assessment is also consistent with the mental evaluators findings.

We also find that substantial evidence supports the ALJ's finding that plaintiff can perform work that exists in significant numbers in the national economy. Utilizing the ALJ's RFC assessment, the VE testified that such an individual could perform work as a bench assembler, production inspector, and surveillance system monitor. (Tr. 439-442). *See Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996).

Although the plaintiff contends that the ALJ erred by failing to further develop the record concerning several of his impairments, we can find no support for this contention in the record. The ALJ is required to order medical examinations and tests only if the medical records presented to him do not provide him with sufficient medical evidence to determine whether the claimant is disabled. *See Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994); 20 C.F.R. §§ 404.1519a(b) and 416.919a(b) (2006). Because the evidence of record was sufficient for the ALJ to determine plaintiff's disability status, further development of the record was not necessary.

**V.    Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus recommends that the decision be affirmed, and plaintiff's Complaint be dismissed with prejudice. **The parties have ten days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may**

24

result in waiver of the right to appeal questions of fact.  The parties are reminded that

objections must be both timely and specific to trigger de novo review by the district court.

DATED this 01st day of July 2009.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

25